# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

NAZILA MAHGEREFTEH and
PATRICIA MONTORO,

     Plaintiffs,

vs.

CITY OF TORRANCE, JOYCE
CHAN, and NICHOLAS P. REA,

     Defendants.

Case No.: CV 17-2835 CBM

**AMENDED**

**ORDER RE: PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT [DKT. NOS. 35, 40]**

     The matters before the Court are the parties' respective motions for partial summary judgment. (Dkt. Nos. 35, 40.) Defendants seek summary judgment in their favor on Plaintiff Mahgerefteh's § 1983 claim for unreasonable seizure under the Fourth Amendment. Plaintiffs seek summary judgment that certain provisions of the Torrance Municipal Code relating to its farmers' market are unconstitutional under the First Amendment and the speech/petition provisions of the California Constitution.

## I. BACKGROUND

     The facts are largely undisputed. Defendant City of Torrance ("the City") owns and operates a public Farmers' Market ("the Market"), which takes place in the parking lot of Charles H. Wilson Park every Tuesday and Saturday from 8 a.m.

to 1 p.m. (Dkt. No. 42, Defendants' Response to Plaintiffs' Statement of Undisputed Facts ("PSUF") # 9.) It is open to the public, and no fee is charged to enter or use the Market, the parking lot, or the park. (PSUF # 9.) The fifth largest farmers' market in the United States, the Market is roughly 79,568 square feet in size and can attract 2,953 or more customers on a given market day. (PSUF ## 29-30, 38.) Defendant Joyce Chan is the Market's manager. (Dkt. No. 45-1, Plaintiffs' Response to Defendants' Statement of Undisputed Facts ("DSUF") # 7.) Defendant Nicholas Rea is a police officer employed by the City of Torrance. (*Compare* Dkt. No. 1 ¶ 7 *with* Dkt. No. 13 ¶ 7.)

Sellers reserve and occupy stalls at the Market to sell their goods and services to the public, and the City generates revenue by collecting a percentage of sellers' gross sales. (PSUF # 10.) The Market also includes a 10' x 30' "Expressive Conduct Area," where spaces may be reserved for activities such as "fundraising and information sharing by community groups and individuals, political outreach[,] and campaigning." (Dkt. No. 37-1, Torrance Municipal Ordinance No. 3791, Ex. A (Torrance Certified Farmers' Market Rules and Regulations ("Market Rules")) §§ I.5, III.4.) The Expressive Conduct Area is divided into three 10' x 10' stalls, and no more than three "Expressive Conduct Users" are allowed to set up a stall in the Expressive Conduct Area per Market day. (PSUF # 26; Market Rules § III.4.) Those who wish to use the Expressive Conduct Area apply in advance for a spot, and a member of the City staff assigns one of the three spaces on a first-come–first-served basis. (DSUF # 4.) Applicants are limited to reserving a space at one Tuesday Market and one Saturday Market each month. (Market Rules § III.4.) Each Market day, any unreserved spaces can be claimed by submitting an application between 7:00 a.m. and 7:30 a.m. (*Id.*) Unreserved spaces are also assigned on a first-come–first-served basis, and there are no limits on the number of times an individual or group may apply for and use an unreserved space. (*Id.*)

The Market Rules prohibit the following activities, except at Expressive Conduct User Spaces:

- "Circulating an initiative or referendum petition, or circulating advertising brochures"
- "Unauthorized solicitation — For purposes of this prohibition, 'unauthorized solicitation' means solicitation that is unrelated to the Market, is not conducted from an authorized selling space, or both. These prohibitions do not preclude any person or organization from conducting these activities during Market hours on sidewalks or other public property adjacent to the Market. Violations of these prohibitions will result in expulsion from the Market for the remainder of that Market day."
- "Commercial photography or videotaping"

(Market Rules § II.8.) Violation of the Market Rules constitutes a misdemeanor. (Torrance Municipal Code § 412.1.1-2.)

Plaintiffs Nazila Mahgerefteh and Patricia Montoro, who regularly attend the Market, are advocates of veganism. (PSUF ## 11-12.) They have engaged in advocacy of veganism at the Market on various occasions. (PSUF # 11.) In June 2016, Montoro reserved an Expressive Conduct Space for Saturday, July 23, 2016. (DSUF # 11.) On Saturday, July 2, 2016, Mahgerefteh and Montoro utilized an Expressive Conduct Space reserved by Mahgerefteh. (DSUF # 10.) On July 6, Chan emailed Montoro to inform her that her reservation of an Expressive Conduct Space for July 23 was forfeited because Montoro had already used an Expressive Conduct Space one Saturday in July. (DSUF # 11.)

On July 23, Mahgerefteh attempted to utilize an Expressive Conduct Space at the market. (DSUF # 12.) Mahgerefteh did not have a reservation for an Expressive Conduct Space on this date, and she was informed by City staff that

she would not be allowed to use the Expressive Conduct Area. (DSUF # 13.[1])
Plaintiff objected and refused to leave. (DSUF # 14.) Chan informed Defendant
Officer Rea and another City officer that Mahgerefteh was violating the Market
Rules and trespassing. (DSUF # 16.) The officers advised Mahgerefteh that she
was not allowed to utilize the Expressive Conduct Area on that day, but she
refused to leave. (DSUF ## 17-18.) The officers then "began to arrest"
Mahgerefteh. (DSUF # 20.) Officer High grabbed Mahgerefteh's right arm, while
Officer Rea grabbed her left arm. (DSUF ## 21-23.) After a few seconds of being
held, Mahgerefteh said that she would leave and the officers released her. (DSUF
## 25-28.)

## II. LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall
grant summary judgment if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the
court of the basis for its motion and identifying those portions of the record it
believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477
U.S. at 323. A factual dispute is "genuine" only if there is a sufficient evidentiary
basis on which a "reasonable jury could return a verdict for the non-moving
party." *Anderson*, 477 U.S. at 248; *see also Scott v. Harris*, 550 U.S. 372, 380
(2007) ("Where the record taken as a whole would not lead a rational trier of fact
to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting
*Matsushita*, 475 U.S. at 586-87). A fact is "material" only if it might affect the
outcome of the suit under governing law. *Anderson*, 477 U.S. at 248.

---

[1] Plaintiffs dispute certain aspects of DSUF # 13, but do not dispute that Mahgerefteh did not
have a reservation for that day or that she was informed by City staff that she would not be
allowed to use the Expressive Conduct Area.

If the moving party satisfies this initial burden, Rule 56 requires the party opposing the motion to respond with a "showing sufficient to establish the existence of [each properly challenged] element essential to that party's case, and on which that party will bear the burden of proof at trial … since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. In attempting to establish a genuine factual dispute, the opposing party may not rely upon conclusory allegations or pleading unsupported by factual data, but instead must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *See Celotex*, 477 U.S. at 324. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50.

"[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." *See Matsushita*, 475 U.S. at 587. At the summary judgment stage, the court's function is not to weigh the evidence or determine the truth of the matter but, rather, to determine whether there is any genuine issue for trial. *Anderson*, 477 U.S. at 249; *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc).

In determining any motion for summary judgment or partial summary judgment, the court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the opposing party's "Statement of Genuine Disputes" and (b) controverted by declaration or other

evidence filed in opposition to the motion. C.D. Cal. L.R. 56-3; Fed. R. Civ. P. 56(e)(2).

### III. DISCUSSION

**A.      Defendants' Motion for Partial Summary Judgment**

Defendants seek summary judgment on Plaintiff Mahgerefteh's cause of action for unlawful arrest in violation of the Fourth Amendment. Defendants argue that Plaintiff's Fourth Amendment rights were not violated because Officer Rea had probable cause to arrest Plaintiff on July 23, 2016 based on a violation of the Market Rules, which constitutes a misdemeanor under the Torrance Municipal Code. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001). This is true even when the arrest is based on a city ordinance that is later declared unconstitutional. *Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979). Accordingly, the constitutionality of the Market Rules themselves is irrelevant to whether Rea's arrest of Plaintiff for violation of those rules was an unreasonable seizure under the Fourth Amendment.

Here, it is undisputed that Mahgerefteh was attempting to use an Expressive Conduct User Space on July 23, 2016, despite the fact that she had not applied for and been assigned a space for that day. (DSUF # 12-13.) She was therefore in violation of the Market Rules, which require an application in order to utilize an Expressive Conduct User Space. (Market Rules § III.4.) This constitutes a misdemeanor pursuant to the Torrance Municipal Code. (Torrance Municipal Ordinance 3791 § 412.1.2(a), Dkt. No. 37-1.)

Mahgerefteh argues that she was not in violation of the Market Rules because she had been hired by Plaintiff Montoro to attend the Market in Montoro's place and use her Expressive Conduct User Space. This argument fails for two reasons. First, Chan had cancelled Montoro's July 23 reservation because

Montoro had used an Expressive Conduct User Space on July 2. (DSUF # 11.)
Accordingly, neither Montoro nor Mahgerefteh had a valid reservation for July 23.
Second, even if Montoro would have had a valid reservation for July 23,
Mahgerefteh did not. The Market Rules do not appear to have any provision that
permits an individual to utilize someone else's reservation, and Mahgerefteh has
not identified one. However, even assuming that Plaintiffs' interpretation of the
Market Rules is correct and an individual may delegate the use of her reservation
to someone else, the Market Rules can also be reasonably interpreted as requiring
a reservation by the individual who is actually utilizing the Expressive Conduct
User Space. Thus, Officer Rea's interpretation of the Market Rules as prohibiting
Mahgerefteh's use of the Space—even if potentially incorrect—was at least
reasonable. When a seizure is based on a reasonable, albeit mistaken,
interpretation of a statutory prohibition, the seizure itself is still reasonable for
Fourth Amendment purposes. *Heien v. North Carolina*, 135 S. Ct. 530, 534, 536
(2014).

Because Mahgerefteh was using an Expressive Conduct User Space without
permission when Rea arrived, Rea "ha[d] probable cause to believe that [she]
ha[d] committed … [a] criminal offense in his presence, [so] he [could], without
violating the Fourth Amendment, arrest the offender." *Atwater*, 532 U.S. at 354.
Accordingly, based on the undisputed facts, Defendants are entitled to judgment as
a matter of law on Plaintiff Mahgerefteh's Fourth Amendment claim for unlawful
seizure.

**B.    Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs seek partial summary judgment declaring § I.5, § II.8, and § III.4
of the Market Rules to be unconstitutional.[2] The relevant provisions are set forth in
an appendix to this order.

---

[2] In their opening brief, Plaintiffs also argue that § II.7 of the Market Rules is unconstitutionally
vague. However, § II.7 is not mentioned in Plaintiffs' notice of the motion (Dkt. No. 40 (Notice

### 1. Construction of the Challenged Provisions

Before turning to the constitutionality of the challenged provisions, the Court must first interpret the provisions to determine what is and is not prohibited by them. *See Frisby v. Schultz*, 487 U.S. 474, 482 (1988). The provisions are contained in three different parts of the statute. The first part is a section defining the term "Expressive Conduct Users" to "include … fundraising and information sharing by community groups and individuals, political outreach and campaigning." (Market Rules § I.5.) This section also establishes an area within the Market to be provided for Expressive Conduct Users on a first-come–first-served basis. (*Id.*)

The second part of the Market Rules containing challenged provisions is a section prohibiting certain activities within the Market area, except in Expressive Conduct User Spaces. (Market Rules § II.8.) The prohibited activities are (1) "[c]irculating an initiative or referendum petition, or circulating advertising brochures"; (2) "solicitation that is unrelated to the Market, is not conducted from an authorized selling space, or both"; and (3) "[c]ommercial photography or videotaping." (*Id.*) "Information sharing" is not on the list of activities prohibited outside Expressive Conduct User Spaces. (*Id.*)

The third part of the Market Rules containing challenged provisions is in a section that sets out the categories of "Admissible Sellers and [P]roducts." (Market Rules § III.) This section includes "Expressive Conduct Users" as a category of admissible sellers "allowed in a designated area of the Market." (Market Rules § III.4.) It also limits the number of Expressive Conduct Users permitted to set up in that area to three or fewer. (*Id.*) Finally, this section sets forth procedures for reserving space in the Expressive Conduct Area and imposes

---

of Motion) at 2), their request for relief (Dkt. No. 40 (Motion) at 22), or their proposed order (Dkt. No. 40-6). Accordingly, the Court does not consider this argument.

limits on how frequently individuals can reserve such Expressive Conduct User Spaces. (*Id.*)

Plaintiffs' motion is largely premised on the assumption that any conduct falling within § I.5's definition of "Expressive Conduct"—specifically, "fundraising and information sharing by community groups and individuals, political outreach and campaigning"—is permitted only within the Expressive Conduct Area. While recognizing that the Rules do not contain any express prohibition to this effect, Plaintiffs interpret the Market Rules to implicitly limit information-sharing and other expressive conduct to the Expressive Conduct Area by setting aside dedicated space for Expressive Conduct Users. Accordingly, their challenge to the Market Rules presumes that any limits on their use of Expressive Conduct User Spaces also constitute limits on their ability to engage in "information sharing" within the Market itself. Three principles counsel against construing the Market Rules in this manner.

First, the Market Rules contain an express provision prohibiting certain expressive activities outside the Expressive Conduct Area—specifically, circulating petitions and advertising brochures, unauthorized solicitation, and commercial photography/videography—and this prohibition is much more limited than the definition of "Expressive Conduct." (*Compare* Market Rules § II.8 *with* Market Rules § I.5.) If the drafters of the Market Rules had intended to prohibit all "Expressive Conduct" outside the Expressive Conduct Area, they could easily have included "Expressive Conduct" in § II.8's list of prohibited activities, but they did not. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusio alterius.*").

Second, because the term "information sharing" is clearly broad enough to encompass "circulating advertising brochures," any implicit prohibition on information sharing outside Expressive Conduct User Spaces would also effect an

implicit prohibition on the circulation of advertising brochures as well. Interpreting the Market Rules in this way would thus treat § II.8's express prohibition "essentially as surplusage—as words of no consequence. Judges should hesitate so to treat statutory terms in any setting…." *Ratzlaf v. United States*, 510 U.S. 135, 140 (1994); *see also South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22 (1986) (It is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)). Because Plaintiffs' interpretation of the Market Rules would render one of § II.8's prohibitions redundant, it is disfavored compared to one that would render the provision operative.

Finally, "Expressive Conduct" as defined in § I.5, which "include[s] but [is] not limited to … information sharing," is such a broad category of expression that a prohibition on all "Expressive Conduct" outside the Expressive Conduct Area would raise serious constitutional concerns. *See Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 573-75 (1987). This counsels against reading such a broad prohibition into the Market Rules absent a clear textual provision to that effect. *See Frisby v. Schultz*, 487 U.S. at 483 ("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties.").

Accordingly, the Court interprets the Market Rules to prohibit only those activities enumerated in § II.8 outside the Expressive Conduct Area. Activities not included in § II.8 are not prohibited by the Market Rules, irrespective of whether they fall into § I.5's definition of "Expressive Conduct." Thus, while Expressive Conduct User Spaces are available to anyone falling within the definition of "Expressive Conduct Users," an individual who does not wish to engage in activities prohibited under § II.8 is not limited to the Expressive Conduct Area when engaging in other forms of "information sharing."

Similarly, the Court interprets the provisions of § III.4 to apply only to individuals wishing to use Expressive Conduct User Spaces, not to individuals engaging in non-prohibited expressive conduct outside the Expressive Conduct Area. Section III.4 is in the division of the Market Rules outlining the requirements to be considered an "Admissible Seller." (Market Rules § III.) Thus, § III.4 only applies to individuals who wish to be admitted into the Market as Admissible Sellers, that is, individuals who wish to set up booths in the Expressive Conduct Area of the Market. This section does not purport to require individuals engaged in permissible "information sharing" outside the Expressive Conduct Area to submit an application in advance, since the application process is for reserving an Expressive Conduct User Space within that area.

**2.      Determination of the Relevant Forum**

Courts apply "forum analysis" when evaluating First Amendment claims relating to speech on government property. Under this approach, the Court must "first determine whether the property [at issue] is a traditional public forum, a designated public forum, or a nonpublic forum in order to ascertain what level of scrutiny to apply to restrictions on speech." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097-98 (9th Cir. 2003) (internal citations omitted).

"The ability to restrict speech in public forums, whether traditional public forums or designated public forums, is 'sharply circumscribed.'" *Id.* at 1098 (quoting *Perry Educ. Ass'n v. Pery Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). In order for the State to enforce a content-based exclusion in a public forum, "it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* (quoting *Frisby v. Schultz*, 487 U.S. 474, 481 (1988)). However, "the government may impose reasonable restrictions on the time, place, or manner of protected speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Such regulations are permissible

as long as they are content-neutral, "are narrowly tailored to serve a significant governmental interest, and … leave open ample alternative channels for communication of the information." *Id.* (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295 (1984)). In non-public forums, the State's regulatory authority is much greater, and restrictions on access will be upheld "as long as [they] are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).

The parties disagree whether the Market area itself constitutes a public forum. Plaintiffs argue that the Market is a public forum because it is held inside a park, which is a quintessential traditional public forum. *See, e.g.*, *American Civil Liberties Union v. City of Las Vegas*, 333 F.3d at 1099 ("The quintessential traditional public forums are sidewalks, streets, and parks."). Defendants do not contest that the park in which the Market takes place is a traditional public forum, but argue that the Market itself is at most a limited public forum because it was created for an express purpose other than providing a forum for speech. This raises an issue that does not fit neatly into the Supreme Court's forum doctrine: the ability of the government to use a traditional public forum for other purposes. The Court is unaware of any binding case law squarely addressing whether a governmental agency may temporarily reserve part of a traditional public forum for its own event, even though that event may preclude the forum's simultaneous use by other speakers.

Under Plaintiffs' view, when an event is held on property constituting a traditional public forum, the character of the property itself—rather than the character of the event—continues to govern access to the property, and thus any restriction on access to the event as a forum for speech must be necessary to serve a compelling governmental interest or must be content-neutral and narrowly tailored to serve a significant governmental interest. The Court is not persuaded. If

Plaintiffs' position were accepted, many time-honored practices that have never been thought to raise First Amendment concerns would suddenly be constitutionally suspect. For example, it is a common practice for municipalities to hold parades. For the duration of the parade, the parade route—a traditional public forum—is rendered unavailable to those who might wish to hold a parade promoting a different message. Thus, the municipality's exclusive reservation of the parade route for its own speech undoubtedly constitutes an exclusion of speakers from a traditional public forum, yet it has never been suggested that a municipality must show the parade serves a compelling or even a significant governmental interest. It is sufficient that it constitutes a legitimate use of government property and that the property remains available for use at other times on a non-discriminatory basis.

Similarly, a public high school lacking an adequately large venue might properly reserve a public park in which to hold its commencement ceremony. It cannot reasonably be suggested that in doing so the school obligates itself to allow members of the public at large to give commencement speeches. Although the park itself may be a traditional public forum when not reserved for another use, a high school commencement ceremony is not a public forum, and nothing in the First Amendment prohibits the school from limiting commencement speakers to those chosen by the school itself. Plaintiffs' argument is therefore too broad. "[I]f the ability to exclude others from public property during the course of a limited, permitted use were found to be a constitutional violation, every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008).

Although the Supreme Court has never squarely addressed this precise issue, many of its precedents provide guidance. Municipalities have a significant interest in coordinating competing uses of public forums, so as not to undermine

13

the usefulness of those forums altogether. "For example, two parades cannot march on the same street simultaneously, and government may allow only one." *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972); *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) ("[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum speech."). Thus, a municipality may properly coordinate the use of a public forum for speech with other legitimate uses of the property. *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941) ("If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets."); *Poulos v. New Hampshire*, 345 U.S. 395, 405-06 (1953).

　　In some instances, the inability to exclude another speaker from a particular public forum at a particular time may impair a speaker's ability to engage in protected speech. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) (holding that Massachusetts violated the First Amendment when it prohibited the South Boston Allied War Veterans Council from excluding a group of would-be speakers from a parade held in a traditional public forum). A city may thus grant a group the exclusive right to utilize a public forum for a particular event and may enforce the exclusion of other speakers with inconsistent messages during that time, as long as the municipality is non-discriminatory in granting speakers the opportunity to use the forum. *See, e.g.*, *Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996) ("[E]ven if plaintiff has alleged sufficient facts to establish that the city authorized the committee to exclude [from a traditional public forum] members of the public who sought to express a discordant message, plaintiff has not alleged that the city violated plaintiff's free speech rights.").

Of course, this authority is still subject to First Amendment limitations, and it cannot be used as a pretext for suppressing otherwise protected speech. "The privilege … to use the streets and parks for communication … must not, in the guise of regulation be abridged or denied." *Hague v. C.I.O.*, 307 U.S. 496, 515-16 (1939) (Roberts, J.). But "[r]egulation and suppression are not the same, either in purpose or result, and courts of justice can tell the difference." *Poulos*, 345 U.S. at 408. The Court therefore concludes that the State, by virtue of its authority to coordinate the multiple legitimate uses of public property, has the ability to temporarily reserve part of a public forum for its own particular use. And during that limited time, "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966). This necessarily implies a limited authority, under appropriate circumstances, to create a temporary non-public forum inside a traditional public forum.

The question remains whether the Market is in fact such a non-public forum. The Sixth Circuit has held that, where a block party is held in a traditional public forum and the event is free and open to the public, the event itself also remains a traditional public forum. *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) ("The City cannot … claim that one's constitutionally protected rights disappear [where] a private party is hosting an event that remain[s] free and open to the public.") (*quoted with approval by Gathright v. City of Portland, Or.*, 439 F.3d 573 (9th Cir. 2006)). Here, in addition to being free and open to the public, the Torrance Farmer's Market bears many of the traditional hallmarks of a public forum. Indeed, the Ninth Circuit has treated similar commercial areas that are open to the public as public forums for First Amendment purposes. *See, e.g.*, *American Civil Liberties Union v. City of Las Vegas*, 333 F.3d at 1103 ("[O]ur case law indicates that we regard public pedestrian malls and commercial zones as the type of property traditionally used as a public forum."); *Gaudiya Vaishnava*

*Society v. City & County of San Francisco*, 952 F.2d 1059, 1061 (9th Cir. 1990) (Fisherman's Wharf and Union Square districts are public forums); *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 576 (9th Cir. 1993) (Olvera Street is a public forum); *Perry v. Los Angeles Police Dep't*, 121 F.3d 1365, 1368 (9th Cir. 1997) (Venice Beach Boardwalk is a traditional public forum). In light of the many similarities between the Market and other commercial areas deemed to be traditional public forums, the Court concludes that the Market is a traditional public forum, no less than Olvera Street or Fisherman's Wharf.

However, the "forum analysis is not completed merely by identifying" the Market as a public forum. *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788, 801 (1985). Rather, the Court must look to "the access sought by the speaker." *Id.* Here, there are two types of access sought by Plaintiffs, with each form of access requiring a separate analysis. Each is discussed in turn below.

### a.     General Access to the Market

The first form of access sought by Plaintiffs is the ability to engage in expressive conduct within the Market area generally. In other words, they seek general access to the Market. "When speakers seek general access to public property, the forum encompasses that property." *Cornelius*, 473 U.S. at 801. This form of access is regulated by § II.8 of the Market Rules, which enumerates the expressive activities prohibited within the Market. Accordingly, the constitutionality of § II.8 is governed by the rules applicable to traditional public forums.

### b.     Expressive Conduct User Spaces

The second form of access sought by Plaintiffs is the ability to set up a booth in the Market and to use that booth as a platform for expression. Courts adopt a more tailored approach to determining the relevant forum when speakers "seek access to a particular means of communication." *Cornelius*, 473 U.S. at 801. Unlike general access to the Market area, which is free and open to the public,

permission to set up a booth in the Market is not granted as a matter of course to the public at large, or even to those qualified to sell at the Market. (*See* Market Rules § III ("Qualifying to sell at the Market does not automatically insure admission in the Market. Admissible Sellers must apply to sell at the Market and be approved by the Market Manager to do so before they are authorized to sell at the Market.").) Except for the three Expressive Conduct User Spaces provided for in §§ I.5 and III.4 of the Market Rules, booths in the Market are authorized at the City's discretion for a non-expressive commercial purpose. These selling spaces are clearly not a designated public forum for expression. *See Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015) ("The defining characteristic of a designated public forum is that it's open to the same indiscriminate use and almost unfettered access that exist in a traditional public forum.") (internal citations, quotation marks omitted).

It is a more difficult question whether Expressive Conduct User Spaces constitute a designated public forum. Access to this particular forum is regulated by § III.4 of the Market Rules, which govern "Admissible Sellers." While these Spaces are set aside for expressive activity, they are not available for "indiscriminate use," nor does the public enjoy "unfettered access" to them. *Seattle Mideast Awareness Campaign*, 781 F.3d at 496. Rather, an application must be submitted in order to use one. Ultimately, however, the Court need not determine whether Expressive Conduct User Spaces constitute a designated public forum or a limited public forum, because the city's regulations regarding the use of the forum survive even under the heightened scrutiny that applies to designated public forums. Accordingly, the Court assumes without deciding that Expressive Conduct User Spaces constitute a designated public forum.

### 3. Constitutionality of the Challenged Provisions

Plaintiffs seek access to traditional and designated public forums, and so any restrictions on that access are subject to exacting scrutiny. "For the State to

1   enforce a content-based exclusion it must show that its regulation is necessary to

2   serve a compelling state interest and that it is narrowly drawn to achieve that end."

3   *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092,

4   1098 (9th Cir. 2003) (internal citations omitted). (quoting *Frisby v. Schultz*, 487

5   U.S. 474, 481 (1988)). However, "the government may impose reasonable

6   restrictions on the time, place, or manner of protected speech, provided the

7   restrictions 'are justified without reference to the content of the regulated speech,

8   that they are narrowly tailored to serve a significant governmental interest, and

9   that they leave open ample alternative channels for communication of the

10  information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting

11  *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295 (1984)).

12      The two forms of access sought by Plaintiffs—access to the Market area

13  generally and the use of Expressive Conduct User Spaces—are governed by

14  different provisions in the Market Rules. Each is discussed in turn below.

15                   **a.      Restrictions on Speech in the Market Area Generally**

16      The restrictions on expressive use of the Market area generally are

17  contained in § II.8,[3] which prohibits the following activities within the Market,

18  except in Expressive Conduct User Spaces: (1) "[c]irculating an initiative or

19  referendum petition, or circulating advertising brochures"; (2) "[u]nauthorized

20  solicitation"; and (3) "[c]ommercial photography or videotaping." (*Id.*)

21      Turning first to the prohibition on "[c]irculating an initiative or referendum

22  petition, or circulating advertising brochures," this is a content-based restriction on

23  speech. Petitions relating to initiatives or referendums are prohibited, but petitions

24  relating to any other subject are not. Similarly, a patron could circulate an

25  informational brochure, as long as it is not an advertisement. As a content-based

26

27  ───────────────

    [3] As explained in Section III.B.1 above, the Court does not construe §§ I.5 and III.4 of the

28  Market Rules as imposing any additional prohibitions on expressive conduct outside the
    Expressive Conduct Area.

restriction on speech, this prohibition must be supported by a showing that it is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. This is a "demanding standard," and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011).

To justify its regulations, the City asserts an interest in preventing disruption to the normal flow of traffic within the market. Assuming, without deciding, that this constitutes a "compelling state interest" for purposes of First Amendment analysis, the Court concludes that the prohibition is nonetheless invalid because it is not narrowly drawn to achieving that end. There is no evidence in the record suggesting that initiative/referendum petitions and advertising brochures pose any more threat to the City's asserted interest than other types of petitions and brochures. Thus, the City's "regulation is wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Id.* at 802. Because the City's prohibition on "[c]irculating an initiative or referendum petition, or circulating advertising brochures" is a content-based restriction on speech that is not narrowly tailored to achieving a compelling state interest, it is facially invalid under the First Amendment.[4] Accordingly, the Court grants Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that the Market Rules' prohibition on "[c]irculating an initiative or referendum petition, or circulating advertising brochures," is facially invalid under the First Amendment.

---

[4] Because the prohibition is invalid as a content-based restriction, the Court need not determine whether a content-neutral ban on circulating any petition or brochure would be valid. *See Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640 (1980) (upholding a State Fair's prohibition on "distribution of any … printed or written material except … from a duly-licensed location" as a reasonable time/place/manner regulation); *but see Lee v. Int'l Soc. for Krishna Consc.*, 505 U.S. 830, 831 (1992) (striking down a "ban on distribution of literature in … airport terminals").

The Court now turns to the prohibition on "unauthorized solicitation," which is defined as "solicitation that is unrelated to the Market, is not conducted from an authorized selling space, or both." (Market Rules § II.8.) Plaintiffs argue that this prohibition should be subject to the exacting scrutiny reserved for content-based regulations, because "solicitation that is unrelated to the Market" is prohibited, while solicitation that is related to the Market is not prohibited. (Market Rules § II.8.) However, this argument overlooks the fact that all solicitation "not conducted from an authorized selling space" is banned, irrespective of its content. (*Id.*) Thus, the rule is content-neutral with respect to solicitation by non-sellers. It is only speech conducted from authorized selling spaces that is being regulated based on its content. Because selling spaces within the Market are not public forums,[5] the use of those spaces for speech are subject to reasonable, viewpoint-neutral regulation. The Court concludes that restricting Market sellers to Market-related solicitation is both a reasonable and a viewpoint-neutral regulation.

With respect to the prohibition on all solicitation "not conducted from an authorized selling space," the Court finds this to be a valid regulation of the time, place, and manner of speech. The Supreme Court has "on many prior occasions noted the disruptive effect that solicitation may have" on a public space. *Int'l Soc. for Krishna Consc. v. Lee*, 505 U.S. 672, 683 (1992). "[Those] who wish to avoid the solicitor may have to alter their paths, slowing both themselves and those around them. The result is that the normal flow of traffic is impeded." *Id.* at 683-84. The First Amendment has "never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses," *Cohen v. California*, 403 U.S. 15,

---

[5] The Court does not understand Plaintiffs to contend otherwise, since access to selling space within the Market is highly regulated and has not generally been opened to the public for expressive purposes. (*See* Market Rules §§ II.1, III.)

19 (1971). Thus, in contexts where the State's interests in "[t]he flow of the crowd and demands of safety are more pressing," the Court has upheld regulations "confining distribution, selling, and fund solicitation activities to fixed locations." *Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 651, 654 (1981). Here, as in *Heffron*, the City's interest in regulating the flow of the crowd "is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest." *Id.* at 654. On Market days, the Market hosts over 100 vendors and nearly 3,000 patrons in a space that is less than 2 acres in area. A regulation confining solicitation activities to booths and areas adjacent to the Market is reasonable and is narrowly tailored to regulating the flow of the resulting crowd within the Market.

In order for the rule to be valid as a time, place, and manner restriction, "it must also be sufficiently clear that alternative forums for the expression of [Plaintiffs'] protected speech exist despite the effects of the Rule." *Heffron*, 452 U.S. at 654. Here, Plaintiffs "may mingle with the crowd and orally propagate their views." *Id.* at 655. Additionally, the Market is surrounded on all four sides by public property—public streets, a public parking lot, and a public park (Dkt. No. 41-2)—and the rules regarding solicitation "do not preclude any person or organization from conducting these activities during Market hours on sidewalks or other public property adjacent to the Market." (Market Rules § II.8.) "Thus the resulting access of those who would solicit the general public is quite complete." *Int'l Soc. for Krishna Consc. v. Lee*, 505 U.S. at 684-85.

Because the Market's solicitation rules are narrowly tailored to achieving a significant state interest and ample alternative forums for solicitation exist, the rules constitute a permissible regulation of the time, place, and manner of speech. Accordingly, the Court denies Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that the Market Rules' prohibition on solicitation are invalid under the First Amendment.

Finally, § II.8 of the Market Rules prohibits "[c]ommercial photography or videotaping" outside the Expressive Conduct Area. Although Plaintiffs seek partial summary judgment that § II.8 is invalid in its entirety, they have not provided any argument or authority for concluding that the prohibition on commercial photography and videotaping is invalid under the First Amendment. Accordingly, the Court denies Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that the Market Rules' prohibitions on commercial photography and videotaping are invalid under the First Amendment.

### b. Restrictions on Access to Expressive Conduct User Spaces

Plaintiffs challenge the City's rules that (1) limit the number of Expressive Conduct Users to three per Market day; (2) require speakers to reserve Expressive Conduct User Spaces in advance; (3) limit Expressive Conduct Users to one Tuesday and one Saturday per month; and (4) prevent speakers from using empty Expressive Conduct User Spaces that are reserved by someone else. Each challenge is discussed in turn below.

Plaintiffs first challenge § III.4's provision limiting use of the Expressive Conduct Area to "[t]hree or fewer Expressive Conduct Users per Market day." The Court finds this to be a reasonable, content-neutral regulation on the use of a designated public forum. The Expressive Conduct Area itself is only 30' x 10' in size,[6] so "allow[ing] unregulated access to all comers could easily reduce rather than enlarge the [Area's] utility as a forum for speech." *Thomas*, 534 U.S. at 322. The City therefore can permissibly restrict the Area to the number of users

---

[6] To the extent Plaintiffs are challenging the size of the Expressive Conduct Area, the Court notes that this is not a restriction on access to the forum, but rather a characteristic of the forum itself. The Court is unaware of any precedent permitting a speaker to challenge the size of a designated public forum on the basis that a larger forum would be more conducive to speech. Indeed, the government is under no obligation to create or maintain a designated public forum. *Cf. Seattle Mideast Awareness Campaign*, 781 F.3d at 496 ("[T]he government may close a designated public forum whenever it chooses…."). It is therefore true *a fortiori* that it is under no obligation to maintain a bigger public forum than it chooses to.

reasonably able to use the forum simultaneously. *Cf. Grayned v. City of Rockford*, 408 U.S. at 115 ("[T]wo parades cannot march on the same street simultaneously, and government may allow only one."). Accordingly, the Court denies Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that limiting the use of the Expressive Conduct Area to three users per Market day is an invalid restriction on access to a public forum.

Plaintiffs also challenge the Market Rules' requirement that Expressive Conduct User Spaces be reserved in advance, arguing that this constitutes an impermissible prior restraint on speech. However, the Court finds the prior restraint cases cited by Plaintiffs inapposite. "[T]he [reservation] required is not the kind of prepublication license deemed a denial of liberty since the time of John Milton but a ministerial … routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved." *Poulos*, 345 U.S. at 403. The reservation requirement "does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say.… And the object of the [reservation] system (as plainly indicated by the permissible grounds for … denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space…." *Thomas*, 534 U.S. at 322. Accordingly, the Court concludes that "the [reservation] scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Id.* Accordingly, Plaintiffs' motion for partial summary judgment is denied insofar as it seeks a determination that the Market Rules' reservation requirement for Expressive Conduct User Spaces is invalid under the First Amendment.

Plaintiffs also challenge the Market Rules' provision "limiting speech to only one Tuesday and one Saturday per month." (Dkt. No. 40 ("Motion") at 17.) However, the Market Rules do not actually prohibit speakers from using

Expressive Conduct User Spaces more than twice per month; they only prevent them from reserving Spaces on more than two days per month. (Market Rules § III.4.d.) If any Spaces for a given Market day remain unreserved at the end of the application period, the Market Manager informs the applicants, who may show up on that day to claim the spots on a first-come–first-served basis. (Market Rules §§ III.4.f-g.) Like the reservation system itself, this is a reasonable regulation that "serve[s] to further the government's interest in coordinating multiple uses of limited public space." *Berger v. City of Seattle*, 569 F.3d 1029, 1042 (9th Cir. 2009). To the extent all spaces are reserved in a given month, the regulation increases the number of users who can reach the crowds at both the Tuesday and Saturday Markets, and to the extent spaces are left unreserved at the end of the reservation period, all would-be speakers are given equal opportunity to claim those spaces on the day of the Market. Accordingly, the Court denies Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that limiting each speaker to reserving an Expressive Conduct User Space on one Tuesday and one Saturday per month is an invalid restriction on access to a public forum.

Finally, Plaintiffs challenge the absence of any rule either (a) penalizing individuals who reserve Spaces but fail to claim them, or (b) forfeiting reservations that are not claimed by a particular time so that others can use the unclaimed Spaces. According to Plaintiffs, this "allows no-show Users to make repeated reservations, leave … spaces vacant, and effectively suppress the number of Users at the Market."[7] (Motion at 18.) Thus, Plaintiffs essentially contend that the City has abridged their freedom to use a designated public forum by failing to impose sufficient conditions on other speakers' use of the forum. Assuming

---

[7] Importantly, Plaintiffs do not suggest that the City itself is actively causing Spaces to be reserved and left vacant in order to decrease the number of Expressive Conduct Users. They simply contend that the policy does nothing to prevent that result.

*arguendo* that the City could permissibly impose such conditions on the use of a designated public forum, Plaintiffs have cited no authority suggesting that an otherwise valid reservation system is rendered invalid by the absence of those conditions. Although provisions penalizing "no-show Users" or forfeiting reservations might have the incidental effect of making more Spaces available for Plaintiffs' use,[8] they would also render the Expressive Conduct Area less accessible to speakers who might only be able to use the Area near the end of the Market day or who are not certain whether they will be able to attend the Market on a given day. Nothing in the First Amendment purports to dictate the City's choice between these two options.

Having adopted a valid reservation system for Expressive Conduct User Spaces, the City can properly prohibit the use of reserved Spaces by those without reservations, in order to maintain their availability for those who reserved them. Accordingly, the Court denies Plaintiffs' motion for summary judgment insofar as it seeks a determination that the First Amendment requires the City to penalize those who fail to claim their reserved Spaces by a particular time.

### 4.    **Plaintiffs' Other Arguments**

Having concluded that § I.5, § II.8, and § III.4 of the Market Rules are not facially unconstitutional under the First Amendment, with the exception of their prohibition on "[c]irculating an initiative or referendum petition, or circulating advertising brochures," the Court now turns to Plaintiffs' alternative arguments for invaliding the provisions. First, Plaintiffs argue the provisions should be invalidated under the California Constitution, because it "provides much greater protection for speech than does the federal constitution." (Dkt. No. 48 ("Reply") at 9.) However, beyond this general assertion, the only difference in protections

---

[8] Plaintiffs argue in their motion that the lack of a forfeiture provision has resulted in Spaces remaining unused on certain Market Days, despite Plaintiffs' desire to use those spaces. However, Plaintiffs have not included this factual assertion in their Statement of Undisputed Facts.

1  identified by Plaintiffs is that under California law, "private property can constitute

2  a public forum for free speech if it is open to the public in a manner similar to that

3  of public streets and sidewalks." *Fashion Valley Mall, LLC v. Nat'l Labor*

4  *Relations Bd.*, 42 Cal. 4th 850, 858 (2007); *see also Robins v. Pruneyard Shopping*

5  *Ctr.*, 23 Cal. 3d 899, 910 (1979) ("[T]he California Constitution protect[s] speech

6  and petitioning, reasonably exercised, in shopping centers even when the centers

7  are privately owned."). Because the property at issue in this case is indisputably

8  public, California's extension of speech protections to private property is not

9  applicable. None of the cases identified by Plaintiffs purport to hold that the

10 California Constitution requires stricter scrutiny of speech regulations on public

11 property than does the federal constitution. Accordingly, Plaintiffs' facial

12 challenge under the California Constitution fails for the same reason as does their

13 facial challenge under the federal constitution.

14      Plaintiffs also argue that, even if the Market Rules are facially permissible,

15 they have been "applied to target Plaintiffs who had a history of frequent use of

16 the Market for their free speech before the Ordinance was enacted." (Motion at

17 17.) If a facially valid ordinance is in fact being used to target Plaintiffs on account

18 of their viewpoint, such application would be unconstitutional under the First

19 Amendment. *See, e.g.*, *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (noting that,

20 even where a facial challenge fails, "a litigant may separately argue that

21 discriminatory enforcement of a speech restriction amounts to viewpoint

22 discrimination in violation of the First Amendment"); *accord City Council of the*

23 *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

24      However, the Court finds that there is a dispute of material fact regarding

25 whether the ordinance has been applied so as to target Plaintiffs. Defendants deny

26 that they target Plaintiffs in their enforcement of the Market Rules. (*See, e.g.*, Dkt.

27 No. 41-1 ("Chan Decl.") at ¶ 14 ("Ever since the adoption of the Ordinance, City

28 staff has always attempted to uniformly enforce the established Rules and

Regulations relating to the reservation and use of the [Expressive Conduct] stalls.").) Although Plaintiffs do proffer some evidence to support their allegation of discriminatory enforcement,[9] Defendants have proffered conflicting evidence.[10] The determination of which evidence to credit and what inferences to draw is properly reserved for trial. Because there is a genuine dispute of material fact regarding whether the City enforces the Market Rules evenhandedly, partial summary judgment on Plaintiffs' enforcement-based challenge is not appropriate.

## IV. CONCLUSION

The Court **GRANTS** Defendants' motion for partial summary judgment. The Court **GRANTS** Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that the Market Rules' prohibition on "[c]irculating an initiative or referendum petition, or circulating advertising brochures" within the Market is an invalid content-based restriction on speech. The Court denies Plaintiffs' motion for partial summary judgment insofar as it seeks a determination that other provisions in the Market Rules are unconstitutional under the First Amendment.

**IT IS SO ORDERED.**

DATED: August 27, 2018

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[9] (*E.g.* Dkt. No. 40-2 ("Mahgerefteh Decl.") at ¶ 8 ("I have personally observed Girl Scout troops using the Zone for four Saturdays in the same calendar month, as well as a man who used the Zone to promote the Democratic party using the Zone on two Saturdays in the same month.").)

[10] (*E.g.* Chan Decl. at ¶ 23 ("On occasion, Girl Scout troops reserve stall space []in the [Expressive Conduct Area], primarily for selling cookies. Each individual troop is subject to the uniformly enforced rule that it may not reserve a space more than one Saturday and one Tuesday per month. Further, Plaintiffs' allegation that a man promoting the Democratic party used the [Expressive Conduct Area] on two Saturdays within the same calendar month is incorrect. He attempted to do so, but I told him he could not attend, and he in fact did not attend.").)

**Appendix**

**Challenged of Market Rules**

I. Definitions

  …

  5. Expressive Conduct Users: Expressive Conduct Users include but are
     not limited to fundraising and information sharing by community
     groups and individuals, political outreach and campaigning. A defined
     area (10' x 30') within the Market footprint will be provided for
     Expressive Conduct Users each market, on a first come – first served
     basis application process.

  …

II. General Policies and Procedures

  …

  8. The following activities are prohibited within the Market, except at
     Expressive Conduct User Spaces:

     • Circulating an initiative or referendum petition, or circulating
       advertising brochures;

     • Unauthorized solicitation — For purposes of this prohibition,
       "unauthorized solicitation" means solicitation that is unrelated to
       the Market, is not conducted from an authorized selling space, or
       both. These prohibitions do not preclude any person or
       organization from conducting these activities during Market
       hours on sidewalks or other public property adjacent to the
       Market. Violation of these prohibitions will result in expulsion
       from the Market for the remainder of that Market day.

     • Commercial photography or videotaping.

  …

III. Admissible Sellers & Products

Admissible Sellers and products fall into the categories defined below. Qualifying to sell at the Market does not automatically insure admission in the Market. Admissible Sellers must apply to sell at the Market and be approved by the Market Manager to do so before they are authorized to sell at the Market. The right to sell at the Market is terminable at any time by written notice to the applicable Seller from the Market Manager.

…

4. Expressive Conduct Users — Groups or individuals are allowed in a designated area of the Market. Three or fewer Expressive Conduct Users per Market day are allowed to set up in the Expressive Conduct Area of the Market. All Expressive Conduct Users are required to fill out an application for review. No one selling mass produced, commercial items (except for fundraising) will be allowed in this area. Admission of Expressive Conduct Users. Prospective Expressive Conduct Users will be considered for participation in the Market by the Market Manager, subject to the conditions listed in subsections a.-h. below. Prospective Expressive Conduct Users will be asked to complete an application, which will include the activity desired to be conducted at the Market and if applicable, products to be sold. Advance scheduling with the Farmers' Market Manager is required before entry into the market. Activities that can take place in this zone include but are not limited to fundraising and information sharing by community groups and individuals, political outreach and campaigning.

   a. Applications will be accepted from the first business day of the month to the end of the Market on the 2nd Saturday of the month for stall assignments in the following month.

b. Applications for Expressive Conduct User spaces will be accepted on a first come-first served basis, and will be date and time stamped upon receipt. Applications can be sent electronically, through the U.S. mail, or hand-delivered.

c. Each applicant for an Expressive Conduct User space will be required to complete a scheduling preference form.

d. Applicants for Expressive Conduct User spaces will be required to select not more than one Saturday Market day and one Tuesday Market day for the appropriate month and list the Market days in which they are interested, in order of preference.

e. The Market Manager will fill Expressive Conduct User spaces on a first come-first served basis, according to the applicant's schedule preferences. If there are more applicants than spaces available, no wait list will be established.

f. The Market Manager will notify Expressive Conduct User applicants of the status of their applications during the week following the third Saturday Market of each month. The Market Manager will also advise applicants if there are Market Days with spaces available.

g. Between 7:00 a.m. and 7:30 a.m. on each Market day, Market staff will be available to accept additional applications for any unreserved Expressive Conduct User spaces for that Market day. Unreserved spaces will be filled on a first come-first served basis.

h. Fundraising is permitted at the Farmers' Market. Selling food is allowable if the organization has obtained an Exemption Certification for Community Events from the Los Angeles County Department of Public Health, Environmental Health

Division. Organizations who fundraise by selling food are required to obtain an Exemption Certification for Community Events permit.